Argued and submitted March 3, 1992, decision of Court of Appeals affirmed in part
and reversed in part; circuit court's injunction stricken in part, otherwise affirmed
March 23, 1993

## LLOYD CORPORATION, LTD.,
a California corporation,
*Respondent on Review,*

*v.*

## Lucinda WHIFFEN,
Hale Lee Weitzman and Eric Stachon,
*Petitioners on Review.*

## SI-LLOYD ASSOCIATES,
an Indiana limited partnership,
*Respondent on Review,*

*v.*

## John DOES 1-100,
*Defendants.*

(CC A8512-08127, A8803-01216;
CA A62648; SC S38606)

849 P2d 446

Gregory Kafoury, Portland, argued the cause and filed the petition for petitioners on review. With him on the petition was Elisabeth Jacobs, Portland.

Sean Donahue, Portland, argued the cause and filed the brief for respondents on review. With him on the brief were Duane Bosworth and Lory J. Kraut, Portland.

Ridgway K. Foley and Bernard M. Ryan, of Schwabe, Williamson & Wyatt, Portland, filed a brief for *amici curiae* Washington Square, Valley River Shopping Center, Oakway Center and Pioneer Place.

David F. Sugerman, of Paul & Sugerman, Portland, and Evelyn Conroy Sparks, of Jolles, Sokol & Bernstein, Portland, filed a brief for *amicus curiae* National Lawyers Guild.

Mark A. Anderson, Portland, filed a brief for *amicus curiae* ACLU Foundation of Oregon.

Mark G. McDougal, Portland, filed a brief for *amicus curiae* Oregon AFL-CIO.

Charles F. Hinkle, Portland, filed a brief for *amici curiae* Fred Meyer, Inc. and PayLess Drug Stores Northwest, Inc. With him on the brief was Alan K. Brickley, Portland, for *amicus curiae* Oregon Land Title Association.

Before Carson, Chief Justice, Peterson, Gillette, Van Hoomissen, Fadeley, and Unis, Justices, and Tongue, retired Justice, pro tempore.

TONGUE, retired Justice, pro tempore

Fadeley, J., concurred and filed an opinion.

Gillette, J., dissented and filed an opinion in which Carson, C. J., and Peterson, J., joined.

## TONGUE, retired Justice, pro tempore

The question presented for decision in this case is whether the owner of a large shopping center, such as the Lloyd Center, may be required by the provisions of either Article IV, section 1 (initiative and referendum), or Article I, section 8 (free speech), of the Oregon Constitution to allow persons to seek signatures on initiative petitions in the common areas of the shopping center.

We hold that persons seeking signatures on initiative petitions in the common areas of the Lloyd Center have a constitutional right to do so under Article IV, section 1, of the Oregon Constitution, subject to reasonable time, place, and manner restrictions. We further hold that three of the present restrictions, as adopted by plaintiff Lloyd Corporation (respondent on review) and approved by the trial court in this case, are unreasonable.

This is the second time that this case has been before this court. In *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*), this court held, on a "subconstitutional basis," that defendants have some right to petition on plaintiff's property. The case then was remanded to the trial court for consideration of reasonable time, place, and manner restrictions upon the exercise of that right. In response to that decision, Lloyd Corporation then adopted rules that limited petition-gathering activity in the Lloyd Center.

Defendants then, from time to time, attempted to solicit signatures for initiative petitions in the common areas of the Lloyd Center. They wish to do so on a scale greater than that permitted by plaintiff's rules.

Plaintiff Lloyd Corporation made application to the trial court for an injunction to enjoin defendants from doing anything not in accordance with Lloyd Corporation's adopted rules. The trial court then entered an injunction enjoining defendants from soliciting signatures on initiative petitions at Lloyd Center in violation of time, place, and manner restrictions in the rules adopted by Lloyd Corporation. Defendants appealed. The Court of Appeals affirmed. *Lloyd Corporation v. Whiffen*, 107 Or App 773, 813 P2d 573 (1991). We

allowed defendants' petition for review and now affirm in part and reverse in part.

## CONTENTIONS OF THE PARTIES
## AND ISSUES TO BE DECIDED

Defendants contend that:

"The Court erred in confining petitioners to specified areas, in requiring 24 hour prior personal written notice of an intent to petition, in limiting the number of petitioners at any given time, and in banning petitioning during the Christmas and Rose Festival seasons."

To the contrary, plaintiff Lloyd Corporation contends that:

1. "On the present record, the court cannot avoid a constitutional analysis."

2. "Forcing the Lloyd Center to Allow Petitioning Activity on its Private Property Violates the United States and Oregon Constitutions.

   "A. Compelling the Lloyd Center to provide a forum on its private property constitutes a taking under Article I, Section 18, and under the Fifth and Fourteenth Amendments to the United States Constitution.

   "B. Compelling the Lloyd Center to provide a forum on its private property for positions with which it disagrees or on which it wishes to remain neutral violates its rights and those of its tenants under Article I, Section 8 of the Oregon Constitution and the First and Fourteenth Amendments to the United States Constitution."

3. "Petitioners do not have a Constitutional Right to Gather Signatures on Private Property.

   "A. Article I, Sections 8 and 26 do not grant petitioners the right to solicit signatures at the Lloyd Center.

   "B. Article IV, Section 1 does not grant petitioners the right to solicit signatures at the Lloyd Center."

4. "Lloyd Center's Rules are a Reasonable Means of Minimizing Safety Risks and Reducing Distractions which Interfere with Commercial Activity."

Several *amicus curiae* briefs also have been submitted in support of the positions of both parties.

During oral argument, a question was raised by a member of the court whether the fact that the City of Portland had vacated eight acres of public streets that now lie inside the Lloyd Center, which occupies about 80 acres, may provide a basis on which defendants may have a right to enter the Lloyd Center to seek signatures on initiative petitions. The parties were then requested to submit supplemental briefs on that question.

Plaintiff Lloyd Corporation, in its supplemental brief, contends, among other things, that vacating a city street extinguishes all of the public's interest in the property. Defendants did not submit a supplemental brief on this issue, but in a letter to the court stated that they would "rely on the arguments submitted on our behalf by amicus curiae." The brief submitted by Oregon AFL-CIO, as *amicus curiae*, states that:

> "[T]he street vacation is not what gives rise to the public's right to gather signatures, rather the public's right arises from the fact that Lloyd Center's common areas are a public forum."

Because neither of the parties contend that the vacation of the streets provides a proper basis for the decision of this case, we find no need to discuss that question.

We next consider the contentions by plaintiff Lloyd Corporation and agree with its first contention that "on the present record, the court cannot avoid a constitutional analysis."

## I. PLAINTIFF'S "TAKING" AND "FORUM" CONTENTIONS

### A. *Plaintiff's "Taking" Contention*

Plaintiff contends that compelling it to provide a forum on its private property is a "taking" under both Article I, section 18, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the Constitution of the United States.

Article I, section 18, of the Oregon Constitution provides:

> "Private property shall not be taken for public use * * * without just compensation[.]"

The Fifth Amendment to the Constitution of the United States provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; *nor shall private property be taken for public use, without just compensation.*" (Emphasis added.)

By the Fourteenth Amendment, the rights of persons as guaranteed under the Fifth Amendment are made applicable to the states.

Plaintiff does not suggest any different analysis under the Oregon Constitution than under the Constitution of the United States. Therefore, we assume, without deciding, that the analysis would be the same under both constitutions. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 572 n 4, 825 P2d 641 (1992), *cert den* ___ US ___, 113 S Ct 467, 121 L Ed 2d 374 (1992) (making that assumption). In addition, as held in *Hughes v. State of Oregon*, 314 Or 1, 34, 838 P2d 1018 (1992), "[n]ot every acquisition of a private property interest by the state constitutes a taking under section 18[.]"

In a previous case involving the Lloyd Center, *Lloyd Corp. v. Tanner*, 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972), the Supreme Court of the United States held that the First Amendment to the Constitution of the United States did not confer upon persons seeking to distribute handbills within the Lloyd Center the right to do so.[1] But in the later case of *PruneYard Shopping Center v. Robins*, 447 US 74, 81-83, 100 S Ct 2035, 64 L Ed 2d 741 (1980), the Court held:

"Our reasoning in *Lloyd*, however, does not *ex proprio vigore* limit the authority of the State to exercise its police

---

[1] The First Amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. * * *

"* * * here there has literally been a 'taking' of that right [to exclude others] to the extent that the California Supreme Court has interpreted the State Constitution to entitle its citizens to exercise free expression and petition rights on shopping center property. But it is well established that 'not every destruction or injury to property by governmental action has been held to be a "taking" in the constitutional sense.' *Armstrong v. United States*, 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960). Rather, the determination whether a state law unlawfully infringes a landowner's property in violation of the Taking Clause requires an examination of whether the restriction on private property 'forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' *Id.*, at 49, 80 S.Ct., at 1569. This examination entails inquiry into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations. * * *

"*Here the requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause.*" (Emphasis added; footnotes omitted.)

*PruneYard Shopping Center v. Robins, supra,* involved a large shopping center in California. Again, assuming that the analysis under Article I, section 18, of the Oregon Constitution is the same as the analysis under the Fifth Amendment to the Constitution of the United States, the result under Article I, section 18, is the same as the result in *PruneYard*. Accordingly, we hold that there is no "taking" in this case in violation of the Takings Clause of the Oregon Constitution or the Fifth Amendment.

### B. *Plaintiff's "Forum" Contention*

Plaintiff contends, in addition, that compelling it to provide a forum for positions with which it disagrees or wishes to remain neutral violates its rights and those of its

tenants under Article I, section 8, of the Oregon Constitution[2] and the First and Fourteenth Amendments to the Constitution of the United States.

Again, plaintiff does not suggest any different analysis under the Oregon Constitution than under the Constitution of the United States. Therefore, we assume, without deciding, that the analysis would be the same under both constitutions. *Dept. of Trans. v. Lundberg, supra*, 312 Or at 572 n 4.

■    Requiring the Lloyd Corporation to permit persons seeking signatures on initiative petitions to have reasonable access to the common areas of the Lloyd Center would not, as contended by Lloyd Corporation,

> "[c]ompel[] the Lloyd Center to provide a forum on its private property for positions with which it disagrees or on which it wishes to remain neutral[,] violat[ing] its rights and those of its tenants under Article I, Section 8 of the Oregon Constitution and the First and Fourteenth Amendments to the United States Constitution."

Again, in *PruneYard Shopping Center v. Robins, supra*, 447 US at 85, the Supreme Court of the United States considered and decided this same question and stated that:

> "Appellants finally contend that a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others."

After discussion of that contention, the Court held:

> "We conclude that neither appellants' federally recognized property rights nor their First Amendment rights have been infringed by the California Supreme Court's decision recognizing a right of appellees to exercise state-protected rights of expression and petition on appellants' property." *Id.* at 88.

Again, assuming that the analysis under Article I, section 8, of the Oregon Constitution is the same as the analysis under the First Amendment to the Constitution of the United States, the result under Article I, section 8, is the

---

[2] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

same as the result under the First Amendment in *PruneYard*. Plaintiff makes no separate or different contention. Plaintiff's constitutional rights to free expression are not infringed by the activities permitted to defendants in this opinion.

## II. ARTICLE IV, SECTION 1, OF THE OREGON CONSTITUTION

Article IV, section 1, of the Oregon Constitution provides:

"(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(d) An initiative petition shall include the full text of the proposed law or amendment to the Constitution. A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith.

"(e) An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon."

In deciding whether the owner of a large shopping center such as the Lloyd Center may be required under Article IV, section 1, of the Oregon Constitution to allow persons to seek signatures on initiative petitions in the common areas of the shopping center, it first must be decided whether the provisions of Article IV, section 1, confer upon

persons seeking signatures on initiative petitions the right to go on private property to which the public has been invited.

In *Lloyd Corp. v. Tanner, supra*, it was held by the Supreme Court of the United States that the provisions of the First Amendment to the Constitution of the United States did not confer upon such persons the right to do so. As previously noted, however, in *PruneYard Shopping Center v. Robins, supra*, that Court affirmed a decision by the Supreme Court of California in *Robins v. PruneYard Shopping Center*, 23 Cal 3d 899, 153 Cal Rptr 854, 592 P2d 341 (1979), *aff'd* 447 US 74 (1980), in which the California court held that such persons had the right to do so under the provisions of the California Constitution.

As also previously noted, in affirming that decision by the California Supreme Court, it was held by the Supreme Court of the United States in *PruneYard Shopping Center v. Robins, supra*, 447 US at 81, that:

"Our reasoning in *Lloyd*, however, does not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. [Citing cases.] In *Lloyd, supra*, there was no state constitutional or statutory provision that had been construed to create rights to the use of private property by strangers, comparable to those found to exist by the California Supreme Court here. It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision."

In *Marsh v. Alabama*, 326 US 501, 506, 66 S Ct 276, 90 L Ed 265 (1946), the Supreme Court of the United States held that:

"The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

Although this court is not bound by that statement by the Supreme Court of the United States in our consideration of the questions presented in this case involving the

interpretation and application of provisions of the Oregon Constitution, we nevertheless agree with that statement.

Plaintiff contends that Article IV, section 1, providing for initiative and referendum, does not "create a right to go anywhere one pleases in pursuit of signatures" on initiative petitions, citing, *inter alia*, a decision by the Michigan Supreme Court in *Woodland v. Michigan Citizens Lobby*, 423 Mich 188, 378 NW2d 337 (1985). Oregon, perhaps more than Michigan, has a long-established tradition of respect for the initiative process.

In addition, as noted *infra*, 315 Or at 514, we do not hold that a person pursuing signatures may go "anywhere one pleases" on the property of the Lloyd Center. We hold only that such persons may seek signatures in the common areas of the Lloyd Center, subject to reasonable time, place, and manner restrictions.

We agree with the view expressed by Williams, C. J., dissenting in *Woodland*, that "[a]ccess to people is the life blood of the initiative power." *Woodland v. Michigan Citizens Lobby, supra*, 378 NW2d at 363 (Williams, C. J., dissenting). We also agree that this "minimal intrusion on the rights of the mall owners is justified in view of the importance of the power of initiative reserved by the people." *Id.* at 365.

The dissent in this case contends that:

> "Because Article IV, section 1, made signature-gathering a part of the legislative function, it seems reasonable to assume that those who voted for the initiative process expected that the right of an individual to gather signatures for initiative petitions would be protected. That does not mean, however, that any such protection is a part of Article IV, section 1. Questions as to *who* can petition and *where* that activity can occur are ancillary to the purpose of Article IV, section 1, which was to establish *the process*." 315 Or at 544 (emphasis in original).

To the contrary, the statement by the dissent that *where* a petitioning activity can take place is *ancillary* to the purposes of Article IV is mere *ipse dixit*. According to the Random House Dictionary of the English Language (2d ed 1987), the word "ancillary" means "subordinate; subsidiary." We hold

that *where* persons may seek signatures on initiative petitions is not "ancillary" or "subordinate" to the purposes of Article IV, section 1, but is essential to its purpose.

We agree with the reasoning of the Court of Appeals in *State v. Cargill*, 100 Or App 336, 343, 786 P2d 208, *rev allowed* 310 Or 133, 794 P2d 794 (1990), in which it is stated:

"It is implicit in Article IV, section 1, that the people must have adequate opportunities to sign the petitions that are necessary for them to act as legislators."

In *Whiffen I, supra*, this court, although deciding that case on a "subconstitutional basis," stated:

"*The signature-gathering process* for political petitions is a form of political speech and no one contests that free speech *is one of our society's most precious rights.* As Justice Brandeis said in his concurring opinion in *Whitney v. California*, 274 US 357, 375, 47 S Ct 641, 71 L Ed 1095 (1927), '[t]hose who won our independence believed that * * * the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.' We might add that *this is a fundamental principle of the Oregon government as well.* No doubt defendants' activity involves a very important public interest. But is that public interest seriously injured if defendants' activity is completely blocked at the Center? We believe that it is." 307 Or at 684-85 (emphasis added).

In that case, this court also stated:

"The process of gathering signatures is *substantially impaired* — almost doubled in time — if conducted on the public walkways or in parks instead of in the mall and on its walkways. Shopping malls have become part of American life. Large numbers of the public gather there. Although plaintiff tries to cloak *a public mall* as a private place, *it is the antithesis of a private place." Id.* at 685 (emphasis added).

By those statements, this court not only considered the initiative process as "one of our society's most precious rights," but held that "the process of gathering signatures is substantially impaired" if signature gatherers are not permitted to gather signatures in the common areas of large shopping malls such as the Lloyd Center. Thus, *where* the

process of gathering signatures can occur is of vital importance in making effective the purposes of Article IV, section 1, rather than "ancillary" or "subordinate" to those purposes.

The dissent also states:

"I have found no case (other than *State v. Cargill, supra*) that relied on a state's constitutional provisions on initiative and referendum as the basis for recognizing a right to petition on privately owned shopping center property." 315 Or at 545.

In *Robins v. PruneYard Shopping Center, supra*, 592 P2d at 345, the California Supreme Court held that:

"In assessing the significance of the growing importance of the shopping center we stress also that to prohibit expressive activity in the centers would *impinge on constitutional rights beyond speech rights*. Courts have long protected the right to petition as an essential attribute of governing. (*United States v. Cruikshank* (1875) 92 U.S. 542-52, 23 L.Ed. 588.) The California Constitution declares that 'people have the right to * * * petition government for redress of grievances * * *.' (Art. I, § 3.) *That right in California is, moreover, vital to a basic process in the state's constitutional scheme — direct initiation of change by the citizenry through initiative, referendum, and recall.* (Cal. Const., Art. II, §§ 8, 9, and 13.)" (Emphasis added.)

That analysis is equally applicable to the problem presented in this case under Article IV, section 1, of the Oregon Constitution.[3]

■ Rather than adopt the restrictive interpretation of Article IV, section 1, proposed by the dissent in this case, this

---

[3] The dissent cites the case of *Batchelder v. Allied Stores Int'l, Inc.*, 388 Mass 83, 445 NE2d 590 (1983), and, after discussion of that case, states (315 Or at 546-47) that:

"Although I have a difficult time understanding how there could not be a 'state action' requirement in Article 9, the construction of the Massachusetts Declaration of Rights is the responsibility of the Supreme Judicial Court of Massachusetts, not of this court. But the effects described by the dissenting justices on the Massachusetts court apply equally in other contexts, including the present one, and certainly demonstrate why, so long as there is a choice, requiring governmental action before there is any need to protect individual rights is a sensible way to construe a constitution."

It is true that *Batchelder* may be distinguished from this case. For the dissent to do so, however, was nothing more than the "setting up of a straw man to knock down," because no contention is made in this opinion based upon *Batchelder*.

court will follow its well-established rule, as held in *State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954), that:

> "It is a fundamental canon of construction that a Constitution should receive a liberal interpretation in favor of a citizen, especially with respect to those provisions which were designed to safeguard the liberty and security of the citizen in regard to both person and property."

■    For the foregoing reasons, we hold that to prohibit the gathering of signatures on initiative petitions in the common areas of large shopping centers such as the Lloyd Center would "impinge on constitutional rights" conferred on the citizens of this state by the provisions of Article IV, section 1, of the Oregon Constitution. Such rights, however, are subject to reasonable time, place, and manner restrictions, as subsequently discussed in Part III of this opinion.

■    This course of reasoning, based largely upon acceptance of the rule of *Marsh v. Alabama, supra,* 326 US at 506 (315 Or at 510-11), the decision of this court in *Whiffen I, supra* (315 Or at 512-13), and the decision by the California Supreme Court in *Robins v. PruneYard Shopping Center, supra* (315 Or at 513), is hardly an "arrogation of power," as charged by the dissent, 315 Or at 556. This opinion does not hold that Article IV, section 1, confers on persons seeking signatures on initiative petitions the right to go on *any* private property to which the public has been invited. This holding is limited to the facts of this case, which involve the common areas of a large shopping center such as the Lloyd Center.

The dissent also contends, 315 Or at 548-49, that for the majority to rest its opinion on rights under Article IV, section 1, to solicit signatures on initiative petitions violates the Due Process and Equal Protection Clause of the Fourteenth Amendment, and constitutes "an invidious form of discrimination that favors one form of political speech at the expense of all other forms [of political speech]."

It is true, as stated by the dissent, that the right under Article IV, section 1, to solicit signatures on initiative petitions is a form of speech and that there also are other forms of speech. We see no need in our opinion in this case to

anticipate and to discuss problems presented by other forms of speech.

For those reasons, we believe that the contentions by the dissent in support of its interpretation of Article IV, section 1, have no validity as applied to the facts and issues presented in this case. To the contrary, we hold that defendants have the right under Article IV, section 1, of the Oregon Constitution to solicit signatures on initiative petitions in the common areas of the Lloyd Center, subject, however, to reasonable time, place, and manner restrictions, as next discussed.

Because we decide this case under Article IV, section 1, of the Oregon Constitution, we need not consider defendants' argument that their right to seek signatures on initiative petitions in the common areas of the Lloyd Center also is protected under Article I, section 8, of the Oregon Constitution.

## III. REASONABLE TIME, PLACE, AND MANNER RESTRICTIONS

Plaintiff Lloyd Corporation contends that persons seeking signatures on initiative petitions inside its shopping mall have no right to be there "in the first place," with the result that plaintiff is entitled to an injunction which would prohibit such activity, both because such persons have no right to be there under either Article I, section 8, or Article IV, section 1, of the Oregon Constitution, and because:

> "The uncontradicted evidence is that petitioning substantially interferes with the commercial enterprise of the Lloyd Center."

We disagree.

For the reasons previously stated, persons seeking signatures on initiative petitions have a right to enter the common areas of the Lloyd Center for that purpose under Article IV, section 1, of the Oregon Constitution. We reject plaintiff's contentions that such persons have no right to do so because such activity "substantially interferes" with its "commercial enterprise." The effect of that contention would be a total ban on such protected activity. In *Whiffen I, supra,* 307 Or at 687, this court held that:

"[P]laintiff is not entitled to an injunction to prohibit peaceful solicitation of signatures in the mall or on its walkways that does not substantially interfere with the commercial activity on the premises. The solicitation of signatures of patrons does not in and of itself constitute substantial interference."

We next turn to a consideration of the rules adopted by the Lloyd Corporation, most of which were approved by the trial court as provisions of its injunction. Because both parties agree that defendants' right to gather signatures in the common areas of the Lloyd Center are subject to reasonable time, place, and manner restrictions, we need not consider the legal basis in case law of that rule.

Defendants contend that five of the seventeen rules adopted by the Lloyd Corporation, and included in the terms of the trial court injunction, are unreasonable in that they "virtually eliminate petitioning, without significantly advancing legitimate interests of [Lloyd Center]." We thus consider the objections to each of those rules.

■ 1. *Rule 4 — Restricting Petitioning to Three Designated Areas*[4]

Defendants object to the provisions of Rule 4, which would limit petitioning to three designated areas in the "Mall level," contending that the petitioners should be permitted to "venture out into the general population, in the common area, in order to approach their fellow citizens."

In defense of that rule, plaintiff offered testimony to support its contentions that the Lloyd Center is designed to allow people to "window shop" and must be "conducive to impulse buying and opportunities for shoppers to look at

---

[4] Rule 4 provides:

"Political petitioning shall occur only on the mall level in the areas set forth as follows:

"a. Area 30 x 50 feet West of spiral staircase at entrance to East Mall.

"b. Area 10 x 30 feet along the railing to the North side of the ice rink, immediately West of the bridge to entrance of the North Mall on the Main Mall level.

"In addition, upon completion of the construction, and re-opening of the premises described as the West Mall, then

"c. Area 30 x 40 feet at entrance to West Mall near West end of skating rink on the main Mall level."

small shops without interference"; that "impulse buying" is a key element in the success of a shopping center; that what defendants demand is "the unfettered right to roam throughout the Lloyd Center" without restriction; and that this would substantially interfere with its commercial enterprise and that of its tenants. Defendants offered no convincing evidence to the contrary.

We agree with those contentions by plaintiff and find that Rule 4, which restricts petitioning to three designated areas, is not an unreasonable restriction on defendants' right to gather signatures for initiative petitions.

### 2. *Rules 1 and 2 — Requiring Advance Notice*[5]

In substance, Rules 1 and 2 provide that at least 24 hours before a person may engage in petitioning, that person must file a written notice with the Lloyd Center office of intent to do so, stating the name and address of such person and the dates and times that each petitioner will be petitioning.

The general manager of Lloyd Center, Larry Troyer, testified that the 24-hour notice requirement was needed "so that we know who [the petitioners] are and when they're going to be there," so as to prevent "contradictory groups [from] petitioning in the same area." Troyer also testified that advance warning assists Lloyd Center management in

---

[5] Rules 1 and 2 provide:

"1. Prior to engaging in political petitioning, a petitioner must notify the Center management office and complete and sign a legible notice form providing the Center with the name, address and signature of the petitioner expected to be soliciting signatures, the dates and times each petitioner will be petitioning, a copy of the petition to be signed and of leaflets or literature to be distributed, if any. This notice form must be filed with the Center office at least 24 hours prior to any petitioning activities, unless such is not required under rule 2, infra.

"2. If a petitioner anticipates petitioning in the Center on a regular basis, the notice form shall specify each specific date and time (up to a maximum of four weeks in advance) that each petitioner will be petitioning at the Center. Thereafter, if that petitioner intends not to petition on any of the designated dates, the petitioner shall give telephone or other notice of that intent to the Center office at least 24 hours in advance, except in emergencies when notice shall be given as soon as possible. An individual petitioning for a petitioner may, so long as this notice form is on file, inform the Center of his or her name upon commencement of petitioning, and shall not be required to have notified the Center of such identifying information prior to commencement of petitioning, so long as this long-term petitioning notice is on file with the Center."

determining staffing needs. He stated that individuals seeking to gather signatures cannot give the required 24-hour notice over the telephone but must "[c]ome in to our receptionist and fill out an application."

The record shows, however, that at least some individuals are deterred from participating in signature-gathering activity by the requirement that they submit a 24-hour written notice to Lloyd Center. In addition, the fact that individuals who seek signatures in support of "contradictory" political initiatives might do so in the same area of Lloyd Center does not necessarily mean that they will cause, as Troyer testified, "more disruption."

After examination of the record, we conclude that the 24-hour notice requirement unduly restricts defendants' signature-gathering activity. Nothing in this record persuades us that such disruption is inherently likely. In the event that such disruption does occur or is threatened, plaintiff may seek relief in court.

■ 3. *Rule 5 — Providing that "no more than two persons for each petition may gather signatures at one time in the Center" and "no more than one person for each petition shall be in any one designated petitioning area"*[6]

We conclude that the trial court's restrictions on the number of individuals who may be involved in soliciting signatures for any particular petition at any one time is too restrictive, given the importance of the interest involved. We find nothing in this record to justify quantifying the number of people who may be involved at any one time. If future experience demonstrates a need for some restrictions, plaintiff will be free to apply for relief in court.

---

[6] Rule 5 provides:

"No more than two persons for each petition may gather signatures at one time in the Center and no more than one person for each petition shall be in any one designated petitioning area. However, upon completion of the construction, and the opening of the third area, described in Rule 4, then no more than three persons for each petition may gather signatures at one time in the Center. No more than a total of three persons who are carrying four or more petitions each shall be permitted in any one area designated for petitioning."

### 4. *Rule 15 — Not allowing petitioning during specified time periods*[7]

■　We also conclude that this rule is not a reasonable time, place, and manner restriction on defendants' right to gather signatures for initiative petitions. Total bans on petitioning activity at specific times are unreasonable *per se*, unless plaintiff can show that the interference is so substantial as to place an "unreasonable" burden on Lloyd Center. Plaintiff's evidence here does not show that.

### CONCLUSION

After consideration of the evidence offered by both parties, we conclude that plaintiff has failed to prove by a preponderance of the evidence that activity by persons seeking signatures on initiative petitions in the common areas of the Lloyd Center, reasonably regulated, would substantially interfere with its "commercial enterprise." To the contrary, there was evidence that such activity, as limited by rules adopted by the Lloyd Center, has caused *no* substantial injury to its business.

Because the provisions of the trial court's injunction requiring that defendants submit a 24-hour written notice to Lloyd Center before entering Lloyd Center to gather signatures for initiative petitions (Rules 1 and 2); that defendants limit the number of signature gatherers (Rule 5); and that defendants may not petition from Thanksgiving Day until January 3 of each year and during the two-week period of the Rose Festival (Rule 15), are not reasonable time, place, and manner restrictions, they are stricken from the trial court's injunction. Otherwise, that injunction is affirmed.

The decision of the Court of Appeals is affirmed in part and reversed in part. Rules 1, 2, 5 and 15, as approved by the trial court's injunction, are stricken. The remaining provisions of the trial court's injunction are affirmed.

---

[7] Rule 15 provides:

"Political petitioning shall not be allowed from Thanksgiving Day until January 3, nor during the annual two-week period of Portland's Rose Festival celebration."

**FADELEY, J.,** concurring.

This case is about limiting by subconstitutional law the scope of separate state constitutional provisions guaranteeing freedom of speech and the initiative process. It is equally about limits on the law's protection of private property open to the public. I concur in the majority opinion of Justice Tongue, but write separately to emphasize that our state constitution's protection of political speech provides a firm foundation for that decision in the context of gathering signatures on an initiative petition. Those two protected values of constitutional magnitude are in conjunction or alignment.

Today the court protects private property from any significant loss related to its commercial purpose and also accords some protection to the constitutionally granted right to initiate legislation.

Collecting initiative signatures is an exercise of political speech directed at change in governmental policies.[1] As such, it may not be prevented outright in the common areas open to the public in this state by invoking the laws or powers of the government to absolutely prohibit speech-related activities of the initiative petitioners. This remains so even though title to the common areas of a place open to the public are held in private ownership.[2]

This same matter was previously before this court in *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (*Whiffen I*). The present decision is a continuation of the same case. It was established in *Whiffen I* that:

---

[1] Article IV, section 1(2)(a) and (b), in part provide:

"The people reserve to themselves the initiative power, which is to propose laws and amendments to the constitution * * * and enact or reject them independently of the Legislative Assembly. An initiative * * * may be proposed only by a petition signed by the [required] number of qualified voters."

[2] ORS 164.205(4), relating to criminal trespass laws, provides:

" 'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required."

Subsection 6 of that statute provides:

" 'Premises' includes any building and any real property, whether privately or publicly owned."

1) as a matter of "subconstitutional" law, gathering initiative signatures is a fundamental exercise of free speech rights described in our state constitution, 307 Or at 680, 684-85;

2) as a matter of fact, exercise of that speech is significantly burdened if that speech is excluded from the common public areas of the Lloyd Center, *id.* at 685, and

3) as a matter of fact, effective exercise of that separate Oregon constitutional right to change the law through the initiative process is also significantly burdened by exclusion of individual signature-gatherers from the common public areas of places where large numbers of voters congregate. *Id.*

At our previous consideration of this matter, this court "lifted" a trial court injunction preventing petitioning at Lloyd Center, and then remanded this case to the trial court. Private property rights were protected, even though recognized to be in conflict with the exercise of both constitutional rights mentioned above. The court adjusted the conflict between property rights and initiative petitioning speech by directions to the trial court to fashion time, place, and manner restrictions reasonably regulating exercise of the petitioning speech rights. By implication, only the common areas of the center open to the public were under discussion, not other areas within the walls of individual stores or other commercial establishments where commerce was directly being transacted. A majority decided that a blanket injunction prohibiting all gathering of initiative signatures was not lawful but that a court might establish or enforce reasonable time, place, and manner restrictions on signature gathering activity.

On remand, Lloyd Corporation adopted rules for its common areas open to the public that, among other things, permit Lloyd to exercise prior restraint to exclude signature gatherers based on the content of the initiative petition that they espouse, require advance notice and individual personal application by signature gatherers, and limit petitioning to a small number of individuals and locations in the common areas at any given time. *Lloyd Corporation v. Whiffen,* 107 Or

App 773, 813 P2d 573 (1991) (*Whiffen II*). Plaintiff Lloyd Corporation now seeks to enforce rules that it has adopted, including rules that would permit Lloyd Corporation to establish prior restraints on the subject matter of petitions brought on the premises and to regulate which persons are permitted to bring any petition at all on a given day.[3] The final trial court response on remand was an injunction enforcing the rules adopted by Lloyd.

On appeal, plaintiff argues that there is not any state law that prohibits collection of signatures on private property, therefore, no state action or law is involved and, without state action, the constitutional protection for speech in conjunction with the initiative process cannot be invoked. Therefore, plaintiff's argument continues, it is entitled to prevent the admittedly political speech involved in initiative signature collection by invoking state law in the form of a prohibitory injunction of a state court.

Plaintiff shopping center owner contends that the state, having granted zoning and other permits that allowed plaintiffs to construct a commercial enterprise on public streets and private land formerly dedicated to other uses,[4] now also must use the power of state law to prohibit defendants' exercise of any right of petition-related political speech on the common areas of the public place so created.

Whether the state may protect that specie of private property by preventing speech, assembly, and petitioning rights thereon is the issue in this and the three related cases now before this court.

---

[3] Lloyd's rules, as adopted, included a declaration that "these rules shall in no way be construed or interpreted as the owners' acquiescence in political petitioning at Lloyd Center in violation of our rights." Other constitutional provisions below are also cited by the parties. Article I, section 26, of the Oregon Constitution in part provides:

"No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner * * *."

Article I, section 8, provides in part:

"No law shall be passed restraining the free expression of opinion * * * on any subject whatever * * *."

[4] *Lloyd Corporation v. Whiffen*, 307 Or 674, 677-78, 773 P2d 1294 (1989) describes the center.

In the other three cases, respectively, shopping center management seek to strictly limit signature gathering in a mall's common areas, *Clackamas Town Center Assoc. v. Wolf*, 315 Or 557, 849 P2d 477 (1993); or to apply sanctions of state criminal law to prevent signature gatherers from requesting signatures on the sidewalk adjacent to an outdoor parking lot serving several businesses, *State v. Dameron*, 101 Or App 237, 789 P2d 707 (1990), *rev allowed* 312 Or 554, 822 P2d 713 (1991); or on a sidewalk located between an outdoor parking lot serving a single department store and that store, *State v. Cargill*, 100 Or App 336, 786 P2d 208, *rev allowed* 310 Or 133, 794 P2d 794 (1990). The property owner in *Dameron* and *Cargill* seeks to use state criminal law and its penalties to prevent the speech represented by initiative signature collection.[5]

Collecting initiative signatures is deemed political speech nationwide. In *Meyer v. Grant*, 486 US 414, 424, 108 S Ct 1886, 100 L Ed 2d 425 (1988), the Supreme Court stated:

"Appellants argue that even if the statute imposes some limitation on First Amendment expression, the burden is permissible because other avenues of expression remain open to appellees and because the State has the authority to impose limitations on the scope of the state-created right to legislate by initiative. Neither of these arguments persuades us that the burden imposed on appellees' First Amendment rights is acceptable.

"That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. * * * The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." (Citations omitted.)

---

[5] It is *the state* and not merely the property owner who decides whether to bring a criminal prosecution and it is the state, not the property owner, who prosecutes the criminal action.

*See Delgado v. Smith,* 861 F2d 1489, 1495 (11th Cir 1988) *cert den* 492 US 918 (1989) (initiative petition process is "core political speech" protected by the First Amendment); *State ex rel Labedz v. Beermann,* 229 Neb 657, 428 NW2d 608, 613 (1988) ("relators have a First Amendment interest in the initiative process").

As noted above, much has already been decided on this subject in Oregon. In *Whiffen I, supra,* 307 Or at 684-85, the majority noted that:

"Here, the public interest is well defined. Defendants seek to collect signatures to initiate public lawmaking. Or Const, Art IV, § 1. Oregon Revised Statutes chapter 250 is wholly devoted to the process of filing petitions and obtaining signatures. * * *

"* * * * *

"Before addressing plaintiff's allegations, we evaluate the injunction's effect on the public interest. The signature-gathering process for political petitions is a form of political speech and no one contests that free speech is one of our society's most precious rights. As Justice Brandeis said in his concurring opinion in *Whitney v. California,* 274 US 357, 375, 47 S Ct 641, 71 L Ed 1095 (1927), '[t]hose who won our independence believed that * * * the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.' We might add that this is a fundamental principle of the Oregon government as well. * * *

"* * * Shopping malls have become part of American life. Large numbers of the public gather there. Although plaintiff tries to cloak a public mall as a private place, it is the antithesis of a private place."

This court also opined that:

"Whether a judicial decision of a private claim invades constitutional rights depends on whether the remedy fashioned by the court invades constitutional rights. * * * In this case, we conclude on a subconstitutional level that plaintiff is not entitled to the broad injunction it sought and received." *Id.* at 680.

Here the owner's effort to prevent solicitation of signatures in the common areas of Lloyd Center would still

leave open "more burdensome" avenues for collecting signatures. But, the availability of other avenues does not diminish the degree of protection afforded signature gathering in itself and as political speech. *Whiffen I, supra*, 307 Or at 685, 687; *Meyer v. Grant, supra*, 486 US at 424.

State recognition of signature gathering as political speech and protection of it from governmental suppression at the behest of private owners of premises open to the public, has been granted not only by this court "subconstitutionally" in *Whiffen*, when it refused to enjoin the signature gathering activity as trespass, but also by the Supreme Court of the United States. In *PruneYard Shopping Center v. Robins*, 447 US 74, 81, 83-84, 100 S Ct 2035, 64 L Ed 2d 741 (1980), that Court explained:

"Our reasoning in *Lloyd* [*Lloyd Corp., Ltd. v. Tanner,* 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972)], however, does not ex proprio vigore limit the authority of the State to exercise its police power or its sovereign right to adopt in its own constitution individual liberties more expansive than those conferred by the Federal Constitution. Cooper v. California, 386 US 58, 62, 17 L Ed 2d 730, 87 S Ct 788 (1967). See also 407 US, at 569-570, 33 L Ed 2d 131, 92 S Ct 2219. In Lloyd, supra, there was no state constitutional or statutory provision that had been construed to create rights to the use of private property by strangers, comparable to those found to exist by the California Supreme Court here. It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision. * * *

"* * * * *

"Here the requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause. There is nothing to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center. The PruneYard is a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large. The decision of the California Supreme

Court makes it clear that the PruneYard may restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions. Appellees were orderly, and they limited their activity to the common areas of the shopping center. In these circumstances, the fact that they may have 'physically invaded' appellants' property cannot be viewed as deterministic."

The Court rejected the claim that state support for signature gathering activity as expressive conduct amounted to a taking of their private property.

"[H]ere appellants have failed to demonstrate that the 'right to exclude others' is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a 'taking.' " *Id.*, 447 US at 84, 64 L Ed 2d at 754.

This court has *unanimously* permitted commercial speech and speakers to intrude into privately owned residential property. In *Hillsboro v. Purcell*, 306 Or 547, 555, 761 P2d 510 (1988), this court held that a city's effort to place an absolute prior restraint on entry of private residential property for commercial purposes was overbroad, because "selling is a form of communicative endeavor that includes speech and may involve goods that are protected expression." Recognition of a constitutional basis for protection of uninvited commercial speech on private residential property has recently been repeated, even where the commercial speech was reproduced by machine. *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993). In these cases, legislative acts were struck down because of speech guarantees, where those acts restricted the intrusion whether or not the residential owner individually objected to it.

Notwithstanding that *Whiffen I* "subconstitutionally" established initiative petitioning activity under Article IV, section 1, of the Oregon Constitution as protected speech under Article I, section 8, there are those who argue in this continuation of the *Whiffen* case that speech guarantees cannot apply to aid those gathering signatures in furtherance of Article IV, section 1, of the Oregon Constitution.

First, it is said that there is no "state action" because no state law has been passed that prohibits the exercise of either petitioning or speech associated with it. Thus, it is said

that, because the government is not restricting or prohibiting the petitioning speech, there is no protection of it at all as against an operator of privately owned premises that are open to the public.

Therefore, as this strain of constitutional interpretation goes, the government's courts must absolutely enjoin the activity, its police must arrest the initiative petitioners, and its prosecutors must seek to convict them of criminal trespass for failure to leave premises open to the public when directed by an operator of such premises to do so.

Proponents of that restrictive interpretation point to criminal trespass laws for support. But they overlook the substantial changes made legislatively in 1971 to require a "lawful" direction to leave. *Compare former* ORS 164.460 (1967) *with* ORS 164.205 and 164.245 (Oregon Laws 1971, ch 743, §§ 135 and 139).[6]

This legislative addition to the elements that must be proved clearly implies that not all directions to leave a premises open to the public are lawful in the sense required to support governmental prosecution and punishment of those who may remain on such premises on some lawful basis.

Leaving aside injunctions and criminal laws as constituting state action and assuming that they are not part of this case, there is other state action involving the government in creation of prime petitioning locations such as common areas of shopping centers. All private property is subject to zoning and other land use regulations. But few landowners receive the required governmental approval to intensively develop land. Governmental approvals included not only favorable change-of-land-use decisions but also privatization of formerly public spaces. These acts confer substantial governmental benefits on the operators of common areas open to the public. These governmental involvements constitute sufficient state action to make state constitutional protections apply to the common areas.

---

[6] The provisions of ORS 164.205, set out in note 2, *supra*, apply. ORS 164.245 requires that the remaining be unlawful and that in turn required that a direction to leave be lawful.

The dissent rejects the majority holding as violative of federal equal protection, relying only on a *"See"* citation to *Carey v. Brown*, 447 US 455, 100 S Ct 2286, 65 L Ed 2d 263 (1980).

But, even assuming that *Carey* controls, petitioning would not be prohibited; it instead would be permitted. *Carey* struck down an Illinois statute, permitting picketing on side-walks in residential areas to express opinions in only three situations, but otherwise prohibiting such picketing in public places located in residential areas. Several members of a civil rights organization were convicted under the statute for picketing the mayor of Chicago's home over busing to achieve racial integration of schools.

Because some picketing was permitted and other picketing was prohibited, and because the disparate treat-ment was based on the differences in the categories of mes-sages conveyed by the pickets, the state statute was declared unconstitutional because that statute discriminated imper-missibly between various subjects of speech and that decision was affirmed by the Supreme Court of the United States in *Carey*. 447 US 455. The result in *Carey* was to permit picket-ing for all subjects of speech, not to prohibit it. If applicable, and if applied to the shopping center case now before this court, *Carey* would not prohibit petitioning in the common areas of the Lloyd Center, rather, it would affirm permis-sibility of there engaging in petitioning and other subjects of speech.[7]

**GILLETTE, J.,** dissenting.

We are confronted with the question whether the private owner of a shopping mall may be required by the terms of certain provisions of the Oregon Constitution to allow persons to solicit signatures on initiative petitions within the common areas of the mall, because such persons

---

[7] This federal equal protection issue was developed by the dissent and was not the thrust of Lloyd Corporation's contentions, which were aimed at excluding all speech not consented to by the corporation. As the dissent states, 315 Or at 547:

"Unquestionably, signature-gathering for initiative petitions is political speech of a kind that lies at the core of values protected by the First Amendment."

have a constitutional right to carry on such activity on premises like shopping malls. A majority of this court, united by its single-minded purpose to reach the present result, purports to find such a right in the initiative and referendum provision of the Oregon Constitution. I disagree with that result, and therefore dissent.

In order to assist the reader, I shall summarize my own views at the outset. I would answer the question presented by this case as follows:

1. No right to carry out petitioning activity on private property can be derived from the initiative and referendum provision of the state constitution.

2. If such a right exists, it exists under the "free expression" provision of the state constitution.

3. The constitutional text protects free expression rights from interference by a "law."

4. Only a government act[1] that results in the extinguishment of free expression rights is such a "law."

5. No such government act has been shown on the record in this case. Indeed, there has been no showing of any government act at all.

6. Therefore, plaintiff Lloyd Corporation is entitled to an injunction enjoining defendants from carrying out initiative petition signature gathering campaigns on its premises.

## FACTUAL AND PROCEDURAL BACKGROUND

Lloyd Center is a retail shopping mall owned by plaintiff and located in Portland. Defendants are individuals who seek to solicit signatures for initiative petitions inside Lloyd Center. Lloyd Center occupies approximately 50 acres. On the inside, it contains walkways that are bordered by store

---

[1] In referring to "government," I speak of all three traditional branches of government, including the judiciary. The judicial branch can make "law" in some circumstances, such as when it announces common law doctrine. But a court's resolution of a dispute between private parties does not necessarily constitute the making of a "law." I reject the argument that might be derived from cases like *Shelley v. Kraemer*, 334 US 1, 68 S Ct 836, 92 L Ed 1161 (1948), to the effect that *any* decision by a state court constitutes the "passage" of a "law" for purposes of state constitutional rules.

fronts and that contain gardens, flower beds, statuary, murals, various other works of art, benches, escalators, stairways and bridges, together with directories and information booths.

From the inception of Lloyd Center's business activity in 1960 until 1989, plaintiff attempted, without discrimination, to prohibit solicitation, distribution of political leaflets, or petitioning in Lloyd Center. Neither tenants of Lloyd Center nor nontenants were permitted to engage in any such activity on the premises. Plaintiff attempted to limit access to Lloyd Center solely to persons whose purpose was to shop or to do business with plaintiff or its tenants.

In 1989, this court decided *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (hereafter cited as *"Whiffen I"*), concluding, on a "subconstitutional" basis, that it was inappropriate to enjoin completely signature-gathering activities in Lloyd Center by means of an injunction that was so broadly worded that it permitted exclusion of anyone who intended to engage in any form of political speech. In response to that decision, plaintiff adopted rules that permitted limited political petitioning activity in Lloyd Center. Defendants have, from time to time, attempted to solicit signatures for initiative petitions in the common areas of Lloyd Center. They wish to continue to do so on a scale greater than that permitted by plaintiff's rules. Plaintiff sought to enjoin defendants from gathering signatures on those privately owned portions of Lloyd Center except where defendants were complying with plaintiff's rules. Following a hearing, the circuit court entered a judgment enjoining defendants from soliciting signatures at Lloyd Center in violation of certain rules that the court fashioned after plaintiff's pre-existing rules. The circuit court stated that, in adopting the rules, it was attempting to fashion an order that complied with this court's decision in *Whiffen I*, discussed *infra*.

Defendants appealed, arguing that the trial court's restrictions that limit the number of petitioners, that require advance notification of an intent to petition, that require petitioners to stay in designated zones, and that ban petitioning altogether during certain holidays and the Rose Festival violate defendants' individual and collective "right" to gather signatures for initiative petitions. The Court of Appeals

affirmed, holding that Lloyd Center's rules "are reasonable and * * * are reasonably related to preventing substantial interference with [Lloyd] Center's business." *Lloyd Corporation v. Whiffen*, 107 Or App 773, 775, 813 P2d 573 (1991).

In affirming the circuit court's injunction, the Court of Appeals relied on its own decision in *Clackamas Town Center Assoc. v. Wolf*, 105 Or App 593, 806 P2d 146 (1991), where the court upheld rules with respect to another shopping center that were similar to those in the present case. The holding in *Clackamas Town Center Assoc. v. Wolf* was based, in turn, in part on this court's opinion in *Whiffen I, supra*, and in part on yet another Court of Appeals case, *State v. Cargill*, 100 Or App 336, 786 P2d 208 (1990). In *State v. Cargill*, the Court of Appeals held that, under Article IV, section 1, of the Oregon Constitution, discussed *infra*, individuals have a right to gather signatures for initiative petitions in "areas that have replaced traditional forums for the collection of signatures, so long as there is no substantial interference with the owner's use of the property for business or other purposes." 100 Or App at 348.

This court allowed review in the present case, together with petitions for review in *Clackamas Town Center Assoc. v. Wolf, supra, State v. Cargill, supra*, and *State v. Dameron*, 101 Or App 237, 789 P2d 707 (1991), to address whether individuals have a right under the Oregon Constitution to seek signatures for initiative petitions on private property and, if so, to attempt to identify under which Oregon constitutional provision such a right exists and under what circumstances (if any) those individuals may be restricted in the exercise of that right.

## *WHIFFEN I*

The majority notes, but devotes little time to, *Whiffen I*. More should be said. That case involved essentially the same parties now before this court. In *Whiffen I*, however, this court stated specifically that it was deciding the case on a "subconstitutional" basis. 307 Or at 680. However, as the following discussion will show, the attempt by the court to put the *Whiffen I* decision on a subconstitutional footing left it with no footing at all.

In *Whiffen I*, the defendants were persons who had entered Lloyd Center to gather signatures for three initiative petitions. The management of Lloyd Center asked the defendants and others who sought to gather such signatures to stop their signature-gathering activity. The defendants refused and continued to enter Lloyd Center to gather signatures. Lloyd Corporation then sought and obtained an injunction barring the defendants from " 'entering * * * [Lloyd Center] to *exercise their expressions of opinions* or to gather signatures in the initiative and referendum process without plaintiff's permission or consent.' " *Id.* at 677 (emphasis supplied). Before this court, the defendants argued that they had a right under the Oregon Constitution to enter Lloyd Center to *gather signatures for initiative petitions. Id.* at 679 n 2, 687. As noted, this court chose not to decide the constitutional issues. Instead, the court specifically held that "on a *subconstitutional* level * * * [the] plaintiff [was] not entitled to the *broad* injunction [that] it sought and received." *Id.* at 680 (emphasis supplied).

The court stated in *Whiffen I* that "[w]hether a judicial decision of a private claim invades constitutional rights depends on whether the *remedy* fashioned by the court invades constitutional rights." *Ibid.* (emphasis supplied). The remedy fashioned by the trial court in *Whiffen I* was too broad, the court held, under equitable principles, because it enjoined the defendants not only from entering Lloyd Center to gather signatures for initiative petitions, but also from *expressing their opinion*. The court stated that "[t]he same judicial remedy — for instance, an injunction — *may be permissible in one case but not in another." Id.* (emphasis supplied). The court described the effect of the trial court injunction in *Whiffen I* this way:

> "Equity simply will not spread a complete blanket over all political activity. People can and do peaceably and unobtrusively *talk* politics at [Lloyd] Center without creating a *need* for the extraordinary remedy of an injunction forbidding people engaged in this type of political activity [— talking politics —] from even venturing onto the property. The trial court went too far in issuing an injunction providing that 'defendants are hereby restrained and enjoined from entering upon plaintiff's property to *exercise their expressions of opinion.' * * * In short, defendants cannot be

enjoined from entering [Lloyd] Center to *express their opinion*, so long as they do so reasonably and without interfering with plaintiff's commercial enterprise."

*Id.* at 686-87 (emphasis supplied). In the court's view, the trial court effectively had enjoined the defendants from entering Lloyd Center and expressing *any* opinion in *any* manner — even opinions as to the quality of merchandise at a retail store or whether a certain retail store was "politically correct." For that reason, the "injunction * * * went far beyond its justification." *Id.* at 689. So it was that the court considered itself entitled to say that *Whiffen I* was resolved on equitable, not constitutional, principles.

Had the *Whiffen I* majority left the matter at that, the opinion would have been — at most — innocuous. But at least some of the court's discussion in *Whiffen I* concerned the effect of the trial court's injunction on the public interest in gathering signatures for initiative petitions. For example, the court stated in *dictum* that "not *all* petition signature-gathering activity on [Lloyd Center] can be enjoined." *Id.* at 687. The court further stated that the trial court's remedy of enjoining signature-gathering activity "went too far." *Id.* The defendants could gather petitions "if they do so reasonably and peaceably." *Id.*

"Moreover, plaintiff is not entitled to an injunction to prohibit peaceful solicitation of signatures in the mall or on its walkways that does not substantially interfere with the commercial activity on the premises. The solicitation of signatures of patrons does not in and of itself constitute substantial interference. The public policy behind the signature-gathering process limits equitable enforcement of plaintiff's preferred total exclusion of signature solicitors."

*Id.* None of that discussion was essential to the *holding* in *Whiffen I*, however. Moreover, that discussion occurred in the context of a discussion as to why Lloyd Center should not have been granted *discretionary, equitable* relief. The court said,

"It bears repeating, to avoid misunderstanding, that the only issue which must be decided in this case as to [Lloyd Corporation's] claim is the scope of equitable intervention, not all legal rights and liabilities that might arise from the acts of either party. An equitable order may be denied,

> limited, or qualified regardless whether a defendant techni-
> cally is a trespasser * * *. [A]ny residual legal issues may well
> be left to [Lloyd Corporations's] remedies at law."

*Id.* at 688.

Although the majority in *Whiffen I* was at pains to keep its decision on a subconstitutional basis, that effort now appears to me to have rendered that opinion essentially meaningless. It is true that, as that opinion asserted, the injunction issued in *Whiffen I* went too far in that it enjoined *any* peaceful and nondisruptive expression of opinion at the Lloyd Center, even if that expression were a *soto voce* exchange between friends. But the court's criticism of the scope of the trial court's injunction in *Whiffen I* was merely abstract and irrelevant unless, after paring down that injunction, the trial court would be under some remaining, affirmative duty to permit the signature-gatherers to exercise *to some extent* their particular form of political speech, *viz.*, signature-gathering, within Lloyd Center. And, if the trial court had a duty to permit that particular form of expression, that duty must derive from some right belonging to the defendants that trumped Lloyd Center's right to control both who came onto its private property and what those people did while they were there. The opinion asserted that the petition-gatherers had certain rights, but it did not identify the *constitutional (or other) source* of those rights. *See generally, Whiffen I*, 307 Or at 693-95 (Carson, J., dissenting). There was a very good reason for that failure to announce a constitutional justification for the *Whiffen I* result: There *is no* satisfactory constitutional justification for that result.

Unlike the trial court remedy in *Whiffen I*, the trial court remedy in the present case does not affect any activity of defendants beyond the gathering of signatures for initiative petitions. The present case, therefore, directly presents the issue that the *Whiffen I* court was at pains not to decide, *viz.*, whether gathering signatures for initiative petitions is a right protected under the Oregon Constitution when that signature-gathering occurs on private property like Lloyd Center. Before I examine that question, however, I believe that it is helpful to review in some detail the way in which the question whether there was some constitutional right to free

expression on even private property has evolved, over time, throughout the country.[2]

## "FUNCTIONAL EQUIVALENCY"

Several courts have held that individuals are entitled to exercise their free expression rights on private property. Those courts have not, however, been able to settle on a single constitutional rationale for that result. What those courts by and large have been able to agree on is the idea that their constitutional outcome (whatever its rationale) is justified because shopping malls and shopping centers have become, as a matter of fact, the "functional equivalent" of town squares or business centers where (they say) political speeches once were given. The Court of Appeals' opinion in *State v. Cargill, supra,* the parties' arguments in the present cases, and the majority's approach, all take that "functional equivalent" idea as a starting point.

The idea of "functional equivalency" is not new. The first case implying such an analytical tool in resolving conflicts between free expression and private property ownership was *Marsh v. Alabama,* 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946), decided by the Supreme Court of the United States under the federal constitution almost half a century ago. Marsh, a Jehovah's Witness, was arrested while handing out religious literature on a sidewalk near the post office in the town of Chickasaw, Alabama. She subsequently was convicted of trespass for having remained on the property of another after being told to leave. The trespass charge was based on the fact that Chickasaw, a suburb of Mobile, was a "company town," wholly owned by the Gulf Shipbuilding Corporation. The Supreme Court described the town this way:

> "Except for [the fact that the company owns the real estate on which it is situated] it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company,

---

[2] My discussion now proceeds along non-traditional lines, in that I first discuss federal constitutional cases before turning to cases decided under the laws of this and other states. I take such an approach in this case because the federal case discussion is pertinent as history, not precedent.

serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. * * * [T]he residents use the business block as their regular shopping center. * * * In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation."

*Id.* at 502-03.

After Marsh's conviction was affirmed in the Alabama courts, she appealed to the Supreme Court of the United States, asserting that her rights to freedom of religion and the press under the First Amendment had been violated. The Supreme Court agreed.

The Court began by noting that it was clear that, had Chickasaw been an ordinary town, it would have been impermissible for such a town to forbid Marsh to do what she was doing, *i.e.*, the town could not have adopted "an ordinance completely barring the distribution of religious literature." *Id.* at 505. The question, the Court said, thus "narrows down to this: Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town?" *Id.*

The mere fact of private ownership of the property did not settle the question, the Court ruled. "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506. Turning its private property into a town placed the owner in a position in which, when the court balanced the owner's interests against the "preferred position" accorded to First Amendment freedoms, the owner's rights had to give way. *Id.* at 509. The Court summarized its rationale this way:

"Many people in the United States live in company-owned towns. These people, just as residents of municipalities, are free citizens of their State and country. Just as all other citizens they must make decisions which affect the

welfare of community and nation. To act as good citizens they must be informed. In order to enable them to be properly informed their information must be uncensored. There is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments [to the Constitution of the United States] than there is for curtailing these freedoms with respect to any other citizen."

*Id.* at 508-09 (footnotes omitted). Accordingly, the Court reversed Marsh's conviction. *Id.* at 510.

Read in context, it is clear that the Court's decision in *Marsh* was motivated to a significant degree by the completeness of the private owner's assumption of the functions, as well as the appearance, of a town. The Court referred specifically to the existence of such things as the sewage treatment plant, the office of a deputy sheriff, and a post office in the town. Later opinions of the Court would emphasize the centrality of that consideration, but the analytical course would be anything but a straight line.

The next pertinent opinion of the Court expanded on the *Marsh* decision. *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza*, 391 US 308, 88 S Ct 1601, 20 L Ed 2d 603 (1968), involved nonviolent picketing by union members of a large, nonunion supermarket located in a shopping center outside Altoona, Pennsylvania. The picketing was carried out almost entirely in a parcel pickup area immediately adjacent to the store. A state judge enjoined the picketing and ordered the picketers to confine their activities to a set of locations that were over 100 yards from the store. The Supreme Court granted certiorari. It described the issue presented as follows:

"The case squarely presents * * * the question whether Pennsylvania's generally valid rules against trespass to private property can be applied in these circumstances to bar [the union members] from [the store and the parking lot that adjoined it]. It is clear that if the shopping center premises were not privately owned but instead constituted the business area of a municipality, which they to a large extent resemble, petitioners could not be barred from exercising their First Amendment rights there on the sole ground that title to the property was in the municipality. [Citations omitted.] * * * [S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise

of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.

"* * * * *

"This Court has * * * held * * * that under some circumstances property that is privately owned may, at least for First Amendment purposes, be treated as though it were publicly held."

*Id.* at 315-16 (citing *Marsh v. Alabama, supra*).

Having defined the issue in that way, the Court majority then went on to find that the "similarities between the business block in *Marsh* and the shopping center in the present case are striking." *Id.* at 317. Those similarities led the Court majority to use the phrase that ever since has been at the center of all of the cases in this area:

"We see no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the 'business district' is not under the same ownership. Here the roadways for vehicular movement within the mall and the sidewalks leading from building to building are *the functional equivalents* of the streets and sidewalks of a normal municipal business district."

*Id.* at 319. That functional equivalency, the Court held, called for the same result in *Logan Valley* that had obtained in *Marsh*: The picketers were entitled "to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." *Id.* at 319-20. The contrary ruling of the Pennsylvania courts was reversed.

Justice Black, who had authored the majority opinion in *Marsh*, dissented from the decision in *Logan Valley*. The Court, he said, had misconstrued *Marsh*:

"I think it is fair to say that the basis on which the *Marsh* decision rested was that the property involved encompassed an area that for all practical purposes had been turned into a town; the area had all the attributes of a town and was exactly like any other town in Alabama. I can find very little

resemblance between the shopping center involved in this case and Chickasaw, Alabama."

*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, supra*, 391 US at 331 (Black, J., dissenting). Justice Black's view was destined to prevail.

The next pertinent Supreme Court case dealt with the same shopping center involved in this case, Lloyd Center. In *Lloyd Corp. v. Tanner*, 407 US 551, 92 S Ct 2219, 33 L Ed 2d 131 (1972), several people wished to distribute at the Lloyd Center handbills that publicized a forthcoming rally against the draft and the Vietnam conflict. A federal district court found as fact that the Lloyd Center is "the functional equivalent of a public business district" and that, in light of *Marsh* and *Logan Valley*, Lloyd Center could not wholly foreclose persons from coming on its premises and exercising their First Amendment rights. *Tanner v. Lloyd Corp.*, 308 F Supp 128, 130 (D Or 1970). The United States Court of Appeals for the Ninth Circuit agreed. *Tanner v. Lloyd Corp.*, 446 F2d 545, 546 (9th Cir 1971).

On certiorari, the Supreme Court of the United States reversed. The Court held that, in focusing on whether Lloyd Center was "the functional equivalent of a public business district," the lower courts had missed the mark. The Court explained:

> "The courts below considered the critical inquiry to be whether Lloyd Center was 'the functional equivalent of a public business district.' This phrase was first used in *Logan Valley*, but its genesis was in *Marsh*. * * * The Court [in *Marsh*] simply held that where private interests were substituting for and performing the customary functions of government, First Amendment freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets."

*Id.* at 561-62 (footnote omitted). The Court then distinguished *Logan Valley*:

> "*Logan Valley* extended *Marsh* to a shopping center situation in a different context from the company town setting, but it did so only in a context where the First Amendment activity was related to the shopping center's operations. * * *

"The holding in *Logan Valley* was not dependent upon the suggestion that the privately owned streets and sidewalks of a business district or a shopping center are the equivalent, for First Amendment purposes, of municipally owned streets and sidewalks. No such expansive reading of the opinion of the Court is necessary or appropriate."

*Id.* at 562-63.

The handbill distributors argued that Lloyd Center was required to permit peaceful activities like theirs by virtue of the fact that Lloyd Center was "open to the public." The Supreme Court specifically rejected that contention:

"There is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve.

"\* \* \* \* \*

"Respondents contend, however, that the property of a large shopping center is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. \* \* \*

"The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh v. Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power."

*Id.* at 565, 568-69 (footnote omitted).

After its significant expansion of the *Marsh* rationale in *Logan Valley*, the Supreme Court clearly was retrenching in its *Lloyd Center* decision. That retrenchment was completed in *Hudgens v. NLRB*, 424 US 507, 96 S Ct 1029, 47 L Ed 2d 196 (1976). In that case, striking members of a union picketed a shoe store in a large shopping mall outside of Atlanta, Georgia. The strike was not against the store, but against the shoe company's warehouse facility, which was not located in the mall. As the case reached the Supreme Court,

one of the principal issues was whether the union members had a First Amendment right to picket inside the mall. The National Labor Relations Board, relying on *Logan Valley*, had held that the members did have such a constitutional right.

The Supreme Court disagreed with the NLRB. Although it had not said as much in its *Lloyd Center* decision, the effect of that decision, the Court majority now stated, had been to overrule the rationale of *Logan Valley*, particularly that part of the rationale that suggested that a large self-contained shopping center is the functional equivalent of a municipality. *Id.* at 518-21.

The effect of the foregoing history of the "functional equivalent" rationale was to relegate that label in First Amendment jurisprudence to those few instances, such as the case of a company town, in which a private property owner had thoroughly and generally assumed the duties or characteristics of government. That doctrine generally did not aid persons who wished to pamphleteer, to petition, or otherwise to express themselves politically in shopping malls. It followed that, if there were any remaining legal basis that such persons could assert, it had to be found in state law.

Arguable state law sources were available. The demise of an expansive "functional equivalent" analysis under the First Amendment coincided with the re-emergence of state constitutions as independent sources of individual rights. Thus, it was not long before private parties who wished to exercise their free expression rights on private property began to claim that they had those rights by virtue of the free speech and other protections found in their state constitutions. It is within that spirit of state constitutionalism that the present case arose.

## THE PRESENT CASE

The two provisions of the Oregon Constitution on which defendants rely[3] as creating a right to gather

---

[3] At least one party and several *amici* mention Article I, section 26, of the Oregon Constitution, as a basis for guaranteeing to individual petitioners a right to gather signatures in shopping centers. Article I, section 26, provides:

"No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances (sic)."

signatures for initiative petitions on privately owned property are Article I, section 8,[4] and Article IV, section 1.[5] The latter provision is the one on which the majority in this case relies. It also was the basis of the Court of Appeals' decision in *State v. Cargill, supra,* 100 Or App at 342-48. I consider it first.[6]

---

However, no party or *amici* has set forth an analysis under Article I, section 26, that is different from that presented under Article I, section 8, and Article IV, section 1, in the present case. The majority does not address Article I, section 26. I therefore shall not do so, either.

[4] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[5] Article IV, section 1, of the Oregon Constitution, provides:

"(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(d) An initiative petition shall include the full text of the proposed law or amendment to the Constitution. A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith.

"(e) An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon."

[6] My discussion now turns to state constitutional provisions, without resort to subconstitutional sources, for two reasons. First, as the previous discussion of *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989), *supra* 315 Or at 531-34, demonstrates, that case itself suffered from a failure to recognize the necessity of constitutional underpinnings for the defendants in that case (like the defendants in the present case) to have some kind of right to exercise political expression on private property. Second, I have found no statute or other subconstitutional source of law that is pertinent. This is regrettable. A legislative solution to the present problem might very well be more satisfactory and certainly would be more systematic than any solution that this court is able to fashion on a case-by-case basis. This topic deserves legislative consideration.

## 1.  *Article IV, section 1*

In *State v. Cargill*, the defendants were seeking signatures on initiative petitions at the main entrance to a Fred Meyer store, a familiar and indigenous form of "one-stop shopping center." The defendants were arrested for second degree trespass after they refused orders by store management to stop their petition-related activities and to leave. The defendants asserted a constitutional right to do what they were doing. A trial court disagreed and convicted them of trespass. On appeal from their convictions, the Court of Appeals reversed, holding that the store — a Fred Meyer store located at S.E. 39th and Hawthorne streets in Portland — was "a modern replacement for the town square or park," 100 Or App at 344, and that its premises therefore "became a forum for assembly by the community." *Id.* at 348. The court concluded that Article IV, section 1, prohibits

> "using a criminal prosecution to prevent the people from collecting signatures on initiative and referendum petitions in areas that have replaced traditional forums for the collection of signatures, so long as there is no substantial interference with the owner's use of the property for business or other purposes."

*Id.*

Consistent with *Cargill*, defendants here also assert — and the majority agrees — that they have a right to gather signatures for initiative petitions under Article IV, section 1. With respect, I submit that both the majority and defendants are in error.

Adopted in 1902, Article IV, section 1, amended the nature and powers of the legislative branch of state government by adding the people themselves to that branch. It required the Secretary of State, in submitting initiatives to the people, to "be guided by the general laws and the act submitting [the] amendment, until legislation shall be especially provided therefor." Carey, The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857, 441 (1926) (quoting the 1902 amendment). By setting forth the initiative and referendum process in the amendment itself, the people " 'put it beyond the power of the legislature to render [the initiative, referendum, and recall

powers] nugatory by refusing to enact legislation to carry them into effect.' " *Stevens v. Benson*, 50 Or 269, 273, 91 P 577 (1907) (quoting *Willis v. Mabon*, 48 Minn 140, 150, 50 NW 1110 (1892)). *Accord Miles et al. v. Veatch et al.*, 189 Or 506, 532, 220 P2d 511, 221 P2d 905 (1950).

Because Article IV, section 1, made signature-gathering a part of the legislative function, it seems reasonable to assume that those who voted for the initiative process expected that the right of an individual to gather signatures for initiative petitions would be protected. That does not mean, however, that any such protection is a part of Article IV, section 1. Questions as to *who* can petition and *where* that activity can occur are ancillary[7] to the purpose of Article IV, section 1, which was to establish *the process*.

No party to the present proceeding questions the proposition that signature-gathering activity is a form of speech. *Whiffen I, supra*, 307 Or at 684. As such it is protected by Oregon's free expression guarantee, Article I, section 8 — one of the most complete protections of free speech to be found in any state constitution. *See State v. Henry*, 302 Or 510, 732 P2d 9 (1987) (even materials that are pornographic or obscene are protected by Article I, section 8). There is nothing in the text of Article IV, section 1, that would suggest or justify the conclusion that this particular form of speech (collecting initiative signatures) is entitled to *even greater* constitutional protection than are other forms of speech, particularly other forms of political speech. Neither is there anything of which I am aware in the history of Article IV, section 1, that would suggest or justify the conclusion that the drafters or the persons supporting the measure intended that the initiative and referendum clauses include the right to collect signatures in the common areas of any privately owned business property that was open to the public. In fact, at the time that the initiative amendment was passed in 1902, it was (and it thereafter remained) a misdemeanor to refuse to leave the premises of another after being directed to do so. 1 Codes

---

[7] The majority quarrels with the use of the word "ancillary." The majority says, "*[W]here* persons may seek signatures on initiative petitions is not 'ancillary' or 'subordinate' to the purposes of Article IV, section 1, but is essential to its purpose." 315 Or at 511-12. (Emphasis in original.) Saying it doesn't make it so. The majority cites *nothing* in the history of or the case law concerning Article IV, section 1, to justify its conclusion. Indeed, it does not even deign to discuss those topics.

and Statutes of Oregon § 1830 (Bellinger & Cotton 1902). The majority's reliance on Article IV, section 1, is not justified by its language or its history.

Resort to cases from other jurisdictions does not help the majority, either. I have found no case (other than *State v. Cargill, supra*) that relied on a state's constitutional provisions on initiative and referendum as the basis for recognizing a right to petition on privately owned shopping center property. A result somewhat analogous to *Cargill* was reached in *Batchelder v. Allied Stores Int'l, Inc.*, 388 Mass 83, 445 NE2d 590 (1983), where the Supreme Judicial Court of Massachusetts upheld the right of a candidate for political office to seek signatures in support of his candidacy at a shopping center.[8] Because that is the only decision by the highest court of any state that even colorably supports the majority's novel theory, I shall examine that decision in some detail.

The court in *Batchelder* relied on Article 9 of the Massachusetts Declaration of Rights, which states:

"All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

Article 9, the majority ruled, did not have a "state action" requirement, *i.e.*, it could be enforced by one private individual against other private individuals. *Batchelder v. Allied Stores Int'l, Inc., supra*, 388 Mass at 88-89. The effect of the court's ruling in this regard was to make every decision under Article 9 a "balancing" decision, because no private party acting in a purely private capacity could defend itself on the basis of that private status — private action could be reached under the article. Thus, it was so clear to the majority in

---

[8] My research also has disclosed two petitioning cases that hold that there is no automatic constitutional right to carry on petitioning activities on privately owned shopping center property. *See People v. Diguida*, 152 Ill 2d 104, 604 NE2d 336 (1992) (signatures for candidate's petition); *Fiesta Mall Venture v. Mecham Recall Comm.*, 159 Ariz 371, 767 P2d 719 (Ct App 1988) (signatures for recall petition); *see also Alderwood Assocs. v. Washington Envir. Council*, 96 Wash 2d 230, 635 P2d 108 (1981), *overruled on other grounds* in *Southcenter Joint Venture v. National Dem. Policy Comm.*, 113 Wash 2d 413, 780 P2d 1282 (1989) (rejecting, by an 8-1 majority, the suggestion that the initiative and referendum provision in that state's constitution added anything to the state constitution's free speech provisions).

*Batchelder* that the shopping center owner's private property rights had to yield to some degree that the majority did not even pause to consider that issue separately. Instead, the court said:

> "The fact that we are dealing with private action on private property and not with public property or with at least direct governmental action is an important consideration. Close attention must be given to the property interests of a mall owner in determining whether an intrusion is reasonable in time, place, and manner."

*Id.* at 92. The question, in other words, was not whether the private property owner would lose — the question was by *how much* the owner would lose. Finding that the candidate's activities could be carried on without interfering with the shopping center's primary purpose of merchandising, the court majority held that the owner could require only that the candidate observe reasonable time, place, and manner restrictions. *Id.* at 93.

Justice Lynch, joined by the Chief Justice and one other Justice, dissented. He made this pertinent point:

> "The plaintiff's argument [which the court majority accepted] that art. 9 entitles him to carry out campaign activities at [the shopping center] because it is 'perhaps the largest center for the congregation of voters in the Sixth District' has potentially broad ramifications. It suggests that art. 9 is violated every time the owner of private property which attracts large concentrations of people bars political campaigning on the property. Article 9 does not reach this far. It is a guarantee that no branch of the government will do anything inconsistent with '[f]airness and the appearance of fairness' in the electoral process. [*Anderson v. Boston*, 360 Mass 178, 195, 380 NE2d 628 (1978)]. It does not ensure that all candidates receive the same level of public exposure. No governmental agency erected any barrier to the plaintiff's campaign. I would find this fact conclusive on the art. 9 issue."

*Id.* at 96.

Although I have a difficult time understanding how there could not be a "state action" requirement in Article 9, the construction of the Massachusetts Declaration of Rights

is the responsibility of the Supreme Judicial Court of Massachusetts, not of this court. But the effects described by the dissenting justices on the Massachusetts court apply equally in other contexts, including the present one, and certainly demonstrate why, so long as there is a choice, requiring governmental action before there is any need to protect individual rights is a sensible way to construe a constitution. In the last analysis, however, any "state action" disagreement is beside the point. As I already have noted, Article IV, section 1, of the Oregon Constitution, is not similar in language, purpose, or history to the Massachusetts provision, and there is nothing in the history of the Oregon provision justifying application of that section under the facts in this case.

In summary, the majority's reading of Article IV, section 1, has these immediately obvious problems: (1) no language in Article IV, section 1, even suggests (much less specifically states) a scope for that provision that the majority now claims for it; (2) no history of the provision supports the majority's reading of it; (3) no cases construing Article IV, section 1, support the majority's reading; and (4) no court in the United States (outside of Oregon) has construed its own initiative provision in a similar way. That lineup should cause even the most heedless to tread softly. The majority, however, does the opposite. There is a result that it intends to reach here and, whatever barriers may be erected by logic, tradition, or precedent, there are the votes to sweep those barriers aside.

The majority's unprecedented reading of Article IV, section 1, creates problems that the majority chooses not to recognize. Moreover, and even if the majority's construction of the scope that provision could be defended in the abstract, there is an important "real world" reason not to pursue it.

Unquestionably, signature-gathering for initiative petitions is political speech of a kind that lies at the core of values protected by the First Amendment. Under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, those core values limit the power of the states to curb political speech. *See, e.g., Carey v. Brown*, 447 US 455, 100 S Ct 2286, 65 L Ed 2d 263 (1980) (Illinois statute that prohibited all picketing of residences or dwellings, but which

exempted peaceful labor dispute picketing, held unconstitutional because it denied equal protection by placing premium on one kind of speech). Yet the majority's reliance on Article IV, section 1, does exactly what the Due Process and Equal Protection Clauses will not permit: It discriminates between different kinds of political speech. *See Carey v. Brown, supra.*

This proposition is easily illustrated. Suppose that, following the publication of the majority opinion in this case, "A" files for and obtains a ballot title for an initiative petition. The petition would amend the constitution by abolishing Article I, section 8 — Oregon's stringent protection of free expression. According to the majority, "A" is entitled to set up shop in Lloyd Center and elsewhere to attempt to obtain signatures in support of the petition. "B" opposes the proposed measure. If "A" were seeking signatures in any normal public forum, such as on a public sidewalk, "B" could set up nearby and, by means of speech, handouts, and placards, urge citizens not to sign "A's" petition. *But, when "A" is operating within Lloyd Center, "B" cannot carry on any countering activity because he — "B" — is not espousing a proposed measure and the right recognized today by the majority extends only to those who are petitioning.*

Such an invidious form of discrimination that favors one form of political speech at the expense of all other forms would not survive Equal Protection Clause scrutiny. *See Carey v. Brown, supra.* And, even if the question were a close one, I cannot understand how the majority can justify giving a construction to Article IV, section 1, that invites litigation over precisely this kind of scenario.[9]

The majority's use of Article IV, section 1, to achieve the public policy result that it so ardently favors cannot be justified by that provision's text, context, or history. Even if it could be so justified, the impermissibility of granting favored status to one form of political speech over all other forms makes it clear that Article IV, section 1, ought not to be read as the majority now reads it. It follows that the decision of the

[9] The majority's response to the foregoing concern, 315 Or at 514-15, resembles the wonderful non-response of the Matthew Harrison Brady character under direct examination in a trial scene from "Inherit the Wind": "I do not think about things that . . . I do not think about!" Jerome Lawrence & Robert E. Lee, Inherit the Wind, Act II, scene 2. Indeed.

Court of Appeals in the present case was, to the extent that it relied on Article IV, section 1, in error. The majority errs in concluding otherwise.

■ *Article I, section 8* [10]

The majority rests its decision in this case on Article IV, section 1. Because I believe that the decision cannot be justified on that ground, I am required to consider Article I, section 8. It is essential in any effort at construing a state constitutional provision to begin with the text of the provision. That is especially important here, because Article I, section 8, begins with words that limit its scope.

Article I, section 8, states, "No *law shall be passed* restraining the free expression of opinion * * *." (Emphasis supplied.) While private parties may make "law" as between themselves through the device of contracts, "laws" are not "passed" by private parties. They are "passed" by governments. Thus, Article I, section 8, protects private parties from *government "laws,"* not the actions of other private parties. *See State v. Spencer,* 289 Or 225, 228, 611 P2d 1147 (1980) (section 8 is a prohibition on the legislative branch). The issues in this case under section 8 thus boil down to two: (1) Is there an attempt by a party to exercise rights of free expression? And (2) is some "law" — *i.e.,* some governmental (as opposed to private) action — restraining those rights in an impermissible way?

The first question need not detain us long. As already noted, there is no question here that defendants were engaged in expressive political activity that is entitled in appropriate circumstances to protection under Article I, section 8. For example, the state could not, under Article I, section 8, have prohibited or punished defendants for their signature-gathering activity if that activity had occurred on

---

[10] In *State v. Cargill, supra,* the Court of Appeals did not address whether the defendants in that case had a right under Article I, section 8, of the Oregon Constitution, to enter a large store's premises to gather signatures for initiative petitions. That court did hold in its earlier decision in *Lloyd Corporation v. Whiffen,* 89 Or App 629, 750 P2d 1157 (1988), that Article I, section 8, guaranteed individuals the right to free expression in Lloyd Center, subject to reasonable time, place and manner restrictions. As noted, however, this court in *Whiffen I* did not address that holding on review, instead resolving the case on a "subconstitutional" basis.

public property that was devoted to or available for political activity.

It is the second question that is the more difficult one in this case. Defendants' political expression occurred in Lloyd Center, privately owned property, and the private owners of Lloyd Center seek to enjoin defendants from exercising their political expression in Lloyd Center. As noted, Article I, section 8, is a limitation on *government*, not on private parties acting privately. Therefore, if plaintiff is to be restrained to some degree by Article I, section 8, it must be because plaintiff's ability to interfere with defendants' expression rights arises out of some "law," as that term is used in section 8.

There is no helpful jurisprudence from Oregon that deals as directly with the question of the relationship between free expression rights and private property as do cases from several other jurisdictions. I therefore turn next to those cases for whatever help they may provide, noting at the outset that virtually every one of those cases has revived, at least for the purposes of discussion, the expansive concept of "functional equivalency" first specifically utilized by the Supreme Court of the United States in the *Logan Valley* case, *supra*, but later interred by that Court in *Hudgens.*

Freedom of expression on private property cases from other jurisdictions may be divided into two categories with respect to "functional equivalency." In one category are those cases in which the court holds that the particular freedom of expression provision in that court's state constitution has no "state action" requirement. Cases that proceed on the assumption that their state constitutions' freedom of expression provisions require no "state action" in order to be used by petitioners, pamphleteers, and others to justify carrying on their activities on private property include: *Alderwood Assocs. v. Washington Envir. Council*, 96 Wash 2d 230, 635 P2d 108 (1981) (plurality opinion), *overruled by Southcenter Joint Venture v. National Dem. Policy Comm.*, 113 Wash 2d 413, 780 P2d 1282 (1989); *State v. Schmid*, 84 NJ 535, 423 A2d 615 (1980), *appeal dismissed sub nom. Princeton Univ. v. Schmid*, 455 US 100, 102 S Ct 867, 70 L Ed 2d 855 (1982); and *Robins v. Pruneyard Shopping Center*, 23 Cal 3d 899, 153 Cal Rptr 854, 592 P2d 341 (1979), *aff'd*, 447 US 74, 100 S Ct

64 L Ed 2d (1980).[11] Those cases are irrelevant to our present inquiry because, as shown, Article I, section 8, *does* embody a requirement of government action, *i.e.*, a "law," in order to trigger its provisions.

The second category consists of those cases in which courts have ruled that there must be a "state action" component with respect to the private property (or the private property owner) in question before it is appropriate even to consider whether particular persons' constitutional rights of expression have been violated. In this category, cases from the highest courts of seven states agree that there is no such "state action" component that is inherent in the private operation of a shopping mall, even if such a mall has become the "functional equivalent" of the traditional town square or business center. Those cases are *Charleston Joint Venture v. McPherson*, 417 SE2d 544 (SC 1992); *Jacobs v. Major*, 139 Wis 2d 492, 407 NW2d 832 (1987); *Western Pa. Soc. Workers. v. Connecticut Gen. Life Ins.*, 512 Pa 23, 515 A2d 1331 (1986); *SHAD Alliance v. Smith Haven Mall*, 66 NY2d 496, 498 NYS2d 99, 488 NE2d 1211 (1985); *Woodland v. Michigan Citizens Lobby*, 423 Mich 188, 378 NW2d 337 (1985); *Cologne v. Westfarm Assocs.*, 192 Conn 48, 469 A2d 1201 (1984); and *State v. Felmet*, 302 NC 173, 273 SE2d 708 (1981).[12]

---

[11] The constitutional provisions at issue in both *Robins v. Pruneyard Shopping Center*, 23 Cal 3rd 899, 153 Cal Rptr 854, 592 P2d 341 (1979), *aff'd*, 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980) and *State v. Schmid*, 84 NJ 535, 423 A2d 615 (1980), *appeal dismissed sub nom. Princeton Univ. v. Schmid*, 455 US 100, 102 S Ct 867, 70 L Ed 2d 855 (1982), did contain references to a "law," but both states' high courts essentially read "law" out of their free expression provisions on policy grounds. I do not consider myself (or this court) to be at liberty to play as fast and loose with constitutional language as some of our sister courts apparently do.

[12] With one exception, each of the foregoing cases develops its thesis as to why "functional equivalency" is not the same as "state action" in some detail. In the interest of the readers' eyesight, I shall not go through those analyses here, beyond noting that I agree with their general thrust. The one exception prompts this footnote: In *State v. Felmet*, 302 NC 173, 273 SE 2d 708 (1981), the Supreme Court of North Carolina was asked to give to its constitutional protection of freedom of expression a broader interpretation than that given the First Amendment by the Supreme Court of the United States. The North Carolina court's entire analysis of that idea was as follows:

"This Court could, under the Supremacy Clause, interpret our State Constitution to protect conduct similar to that of defendant without infringing on any federally protected property right of the owners of private shopping centers. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). However, we are not so disposed."

*State v. Felmet, supra*, 302 NC at 178, 273 SE2d at 712.

I agree with the cases from Connecticut, New York, Michigan, Wisconsin, and elsewhere to the extent that they hold that there is nothing inherent in running a large, successful shopping mall that turns such an activity into a form of governmental action that then must make some accommodation for rights of free expression. It may be true that such shopping malls have, as a practical matter, replaced other forms of business areas in many cities and towns. Or it may be that, as has occurred in Portland, shopping malls have spurred cities to reexamine their downtown areas to compete effectively through improved transit and revitalized shopping facilities. It may also be true that economic change creates new challenges for those with political messages who wish to reach a wide audience. It certainly is true that, somewhere between the archetypal situation of a company town, such as that involved in *Marsh v. Alabama, supra*, and the equally archetypal situation of a corner "mom and pop" grocery and sundries store, there is a line that separates those private ventures on private property that must respect freedom of expression guarantees from those that need not do so. I simply note here that the foregoing generalities concerning the social and economic realities resulting from the success of shopping malls do not, *ipso facto*, place either the creation or the operation of a particular shopping mall on the government action side of the line. To fall on the government side, there must be something more — "state action" or, as it is put in our constitution, a "law."

In contrast to the seven cases just described, I have found only one case that both accepts my premise concerning the necessity for a "law" and still suggests, albeit in dictum, that a mall can be required to permit expressive activity on its premises. That case is *Bock v. Westminster Mall Co.*, 819 P2d 55 (Colo 1991). In *Bock*, two persons who were members of a political association called "The Pledge of Resistance" sought permission to distribute pamphlets and to solicit protest signatures in the common areas inside a large mall. The mall owner, consistent with its policy to prohibit all such activity, denied permission. Litigation followed.

The Supreme Court of Colorado determined two issues. First, it determined that, before a party would be entitled to exercise the party's right to freedom of expression

under the Colorado Constitution[13] inside a privately owned mall, some form of government action or involvement in the mall would have to be shown. *Id.* at 60. The court stated:

> "Where governmental entities or public monies are shown by the facts to subsidize, approve of, or encourage private interests and such private interests happen also to restrict the liberty to speak and to dissent, this court may find that such private restrictions run afoul of the protective scope of Article II, Section 10. It is possible for interests, otherwise private, to bear such a close relationship with governmental entities or public monies that such interests are affected with a public interest. Moreover, with or without the benefit of that relationship, a private project may develop and operate in a manner such that it performs a virtual public function."

*Ibid.*

The Colorado court then went on to find that there was sufficient interaction between the government and the mall owner to make the mall a place that was "affected with a public interest." *Ibid.* The court described the factors that led it to that conclusion:

> "Our finding that governmental involvement exists here is not based on any single factor. Nevertheless, we find significant the City's two million dollar purchase, financed through the sale of municipal bonds, of improvements which the [mall owner] made to adjacent streets and drainage systems. * * *
>
> "Also significant is the fact that the City operates a police substation in the Mall from which the police respond to complaints throughout the City. The [mall owner] provides the space rent free to the City and, in effect, the Mall thus provides a municipal service.* * *
>
> "Finally, there is a highly visible governmental presence in the Mall. The Army, Navy and the Marine Corps maintain recruiting offices in the Mall. The Jefferson County Clerk conducts voter registration drives in the Mall, reminding citizens of their political duties. In sum, the financial participation of the City in the Mall's progress, the arrangements

---

[13] Article II, section 10, of the Colorado Constitution provides in part:

"No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty * * *."

with the City police substation, and the active presence of other governmental agencies in the common areas of the Mall, constitute governmental involvement in the operation of the Mall."

*Id.* at 61-62.

The foregoing analytical approach, focusing as it does on whether there is sufficient governmental involvement in the creation or operation of the mall to justify treating the common areas of the mall as being a public forum, may be an appropriate approach. I agree with the Colorado court that certain of the activities that it describes seriously compromise any claim that the mall owner might make to being a purely private operation. For example, it is difficult to see how it would be possible for the mall owner to permit operation of a rent-free police substation on the premises and, at the same time, deny to any person the right to demonstrate in a peaceful and nondisruptive way inside the mall against some controversial act of the officers who used the substation. Similar considerations would apply to the recruiting offices. However, the Colorado court's analysis would not aid defendants in the present case. None of the criteria used by the Colorado court are shown on this record to apply to the Lloyd Center.

Although the foregoing analysis was a sufficient basis for its holding, the Colorado court unfortunately did not stop there. Instead, it also made the following statement:

"We are also persuaded that the Mall functions as the equivalent of a downtown business district. * * * Walking through or sitting in [the Mall's] open areas each year are many thousands of the public who otherwise engage, no doubt, in conversations on all subjects, including the political. Thus, the historical connection between the marketplace of ideas and the market for goods and services is not severed because goods and services today are bought and sold within the confines of a modern mall. To conclude otherwise would be to allow the vagaries of contemporary urban architecture and planning, or the lack thereof, to prevail over our valued tradition of free speech."

*Id.* at 62. I already have explained why I think this sort of analysis is wrong. Business success does not turn purely private acts into governmental ones. In light of the factors

that it already had enumerated, one is left to wonder whether the *Bock* court would have made the last quoted statement without the presence of the factors already enumerated. It is, at most, a statement wholly unnecessary to the court's holding, *i.e.*, a *dictum*.

As discussion of the *Bock* case indicates, if any kind of symmetry is to be maintained in the scope of Article I, section 8, there must be a legally recognizable connection between a "law" and a particular piece of private property before the constitutional restraints on interference with free expression can be applied to the owners of that private property. It is not enough to justify applying constitutional limitations to the use of private property simply by arguing that the private property is a popular meeting place to which the public is invited. If that were enough, private property owners would, in effect, be penalized for their entrepreneurial success in putting their property to a business use that attracts many customers. The Oregon Constitution should not now be rewritten to punish successful private entrepreneurship.

Does the record in the present case show a connection between government and plaintiff's creation or operation of their shopping center such that efforts by plaintiff to exclude defendants from Lloyd Center constitute a "law * * * restraining free expression"? I already have indicated that the kinds of factors on which the Colorado court relied in *Bock v. Westminster Mall Co., supra*, are not present. It may be that still other kinds of factors also could demonstrate the necessary connection between government and private property, but none suggests itself here. I would hold that, on this record, defendants have not been shown to have a right, under Article I, section 8, of the Oregon Constitution, to enter into plaintiff's shopping mall and carry on petition-gathering activity in the mall's common areas.

Four members of this court favor an outcome to this litigation that requires Lloyd Center to permit petitioning activity on its premises. A proper analysis of the pertinent Oregon constitutional text will not support that outcome, as I have shown. Undeterred, the four either rewrite or ignore the constitution to achieve that outcome anyway. This is — and

will be seen to be — an arrogation of power, not an exercise in jurisprudence. I respectfully dissent.

Carson, C. J., and Peterson, J., join in this dissenting opinion.